I'm going to turn it over to my colleague Sarah Kuntzler and I represent Diego Mateo in connection with this matter. Your Honor, the plea agreement my client signed permitted the government to seek a non-guideline sentence. So you may be asking yourselves, why are we even here? And we're here because the government breached Mr. Mateo's reasonable expectations resulting in serious unfairness. As this court has held, serious unfairness does not require bad faith. Only the government change in position without new justification alters the stakes so drastically that the plea cannot be considered knowing or voluntary. And that is exactly what happened here. The government extended a plea agreement to my client and reasonably believed that the government would seek a sentence within the stipulated guidelines range. This belief was grounded in the fact that the government never communicated an intention to defense counsel to seek an above guidelines range and common practice. The terms of the plea agreement themselves communicated that it might seek a non-guidelines sentence, correct? Yes, that's true, Your Honor. And that goes to my second point, which is common practice. That language, that either party may seek a sentence outside of the stipulated guidelines range, is in fact standard Southern District of New York plea language. How is there a reasonable expectation that it wouldn't happen if the plea agreement explicitly said it could happen? Well, it is normally, as Judge Kaplan observed in Baker, it is normally the case that the government sticks to that range. It is part of how we advise our clients. It is part of how Mr. Mateo's trial counsel told the court they advised him. That when the government has a range, the government controls that number. The government is in control of what the guidelines range is. And a plea agreement is intended to give defendants an understanding of the government's position. This is not a Pimentel letter where the government just says, here's our estimate of the range, full stop. You say the government is in control of what the guidelines range is. I'm not sure that I understand that. The government is in control of charging decisions. And those charging decisions result in what the guidelines calculation is. The government is thinking about this when they're determining culpability. And they're thinking about this when they're charging clients. And the guidelines themselves take into account the difference between roles. So the rule that you're proposing, I think, although I don't know that it's explicit, is that in each one of these cases where there's a plea agreement that allows both sides to argue for a guidelines, an above guidelines range, that each party must tell the other in advance, well in advance, that they plan to do that. Is that the rule? I mean, you know, the common practice of the office- Is that the rule? I don't think it's- I think that you have to look at the facts of this case. The government- I don't think you can say it's the rule because you didn't give the government notice. And you did exactly the same thing in the other direction. That is always what defense counsel does. And it is very rarely what the government does. And the government, in their papers, explaining why, in their sentencing submission, they said, this is an extreme case. Right? The only reason we're doing this is because this here is extreme. Didn't defense counsel below say we are not arguing that the government violated the agreement? They said that at sentencing. And sentencing is a place- At sentencing. And isn't that- why isn't that a waiver of the argument that there's a breach? Well, you don't- when you make a Rule 29 argument, you're not required to remake it. You're not arguing at sentencing again for a new trial, right? You're arguing some of the same facts in connection with 3553A. When you make a motion to withdraw a plea, you're preserving your motion to withdraw the plea. It doesn't make sense to argue to withdraw the plea at sentencing. We make the same arguments underlying that motion in connection with 3553A factors. That motion had already been decided. That issue had already been preserved at that point. But, you know, here, the government says this- they didn't do this lightly. They did this in this case because of the extreme nature of my client's crimes, right? So this is- they saw this case as an outlier. You seem to be saying that they violated an agreement that gave them the latitude to do what they did. I'm saying they breached reasonable expectations. What this court has held is something- is a- you know, there's a set of case law about reasonable expectations that don't involve a literal breach of the terms of the agreement. Breach someone else's expectation. I'm not sure that that even makes sense conceptually. Well, I mean, when you- I mean, this court has a line of cases about Wilson, Havas, and Taylor, all about reasonable expectations, right? And that is- when that happens is we're not just looking at the strict terms of the agreement. We're looking at a change in the government's position from the time of extending the agreement to the time of sentencing that alters the state so drastically that the plea cannot be considered knowing involuntary. And I'm arguing that staying silent when you're offering the plea is making this look like every other case. Like the- Do we have to- I'm sorry, go ahead. I was going to say, if we accept that rule, then we're rendering the terms of the agreement meaningless. Because it doesn't matter what the agreement actually says. It's what people in their own minds expect it. And how do we operate on that basis? Well, right now you have defendants coming again and again to this court for redress in this position with these agreements, those outlier cases, those extreme examples where the government is- because most of the time this does not happen. And most of the time the advice that we give our clients bears out. And in some of these cases, it is- our reasonable expectations are breached as lawyers. And the advice we give our clients is wrong, right? Does there need to be some finding or determination of a form of sandbagging? In other words, is it okay in your view, is it reasonable for the government at the plea to have an expectation that it will not make a particular argument for an above-guideline sentence or a guidelines-range sentence and then change its mind in advance of sentencing? Is that reasonable? Or is your argument premised on the notion that the government at the time of the plea, it understands that notwithstanding the language and the expectation, it will argue for a sentence substantially above the range set forth in the plea agreement? Well, I think you have to look at the specific facts of this case too. I don't think this is necessarily a per se rule. If you look at the terms in this agreement, the government had my client stipulate to facts, right? So there was a universe of facts. There was additional conduct beyond the conduct that- beyond the charged conduct that my client had to stipulate to in this plea agreement that did not result. And to include those additional facts, to stipulate to a guidelines range and to stipulate to additional facts and to stay silent with your adversary about how you- about your view of the case. This goes to my- this goes to my question. Yeah. Do you then have to make a determination or does someone, some judge, have to determine that at the time of the plea, at the time that the government entered this plea agreement with stipulated facts, it knew that it was going to ask for a sentence above the range set forth in the plea agreement? Or is it that at any point after the plea, if it changes its mind based on perhaps new facts, that unsettles the reasonable expectations of the parties? Well, here there were no findings made, right? Because my client raised this issue and the judge held no hearing. How is that in your- to your benefit? Because it was a- because this was a material breach that my client raised, right? And my client had reasonable grounds to raise this. My client asserted that his reasonable expectations were violated. And without probing what the government, you know, what that reasonable understanding was, the court issued a denial without looking into the facts of how this arose. And I- and I think that does a real disservice to- to your honors. And I think it does a disservice to- to clients raising these issues when they raise them and it's denied based on- based on the plain text of the agreement without looking into what the reasonable understanding of the parties was. And- and my client is, you know, bargains away really important rights. Criminal defendants bargain away really important rights when they enter into these agreements. And that's why they need- this needs to be strictly scrutinized and why the- the understanding of the defendant, who is the weaker party in this negotiate- negotiation, needs to be considered. And that is not considered here. I mean, when you- Really the question is, why then? Understanding that there is unequal bargaining power, but why then enter into an agreement that allows the government to argue for a sentence above the range set forth in the agreement? That's- that's the issue. But you- you've- so I'm trying to- so you have reserved some time for rebuttal. I think that we'll hear from the government. Is that right? Or will we hear from Mr. Tamayo? You know, we'll- we'll hear from the government and then we'll proceed that way. Is that okay? Right. We don't have a separate rebuttal. Yeah. Yes. Yeah. Are you done with me, honestly? No, we're never done with you, Ms. Kuchler. Have a seat and then we'll hear from you soon. Very good. Thank you. So why don't we set the clock for ten minutes for the government and then we'll hear- is that okay, Mr. Tamayo? Good morning. Good morning. May it please the court. I'm Assistant U.S. Attorney Adam Hobson. I represent the government on appeal as I did in both of these cases below. This appeal arises out of our prosecution of the Black Mob, which at the time was the largest and most violent of the Latin King sets in New York City, and Diego Mateo was the founder and leader of that gang. I think the court understands our position from its questions, so I will be happy to address any issues the court has. I would just say that no matter what standard of review the court applies here, there was absolutely no breach of the plea agreement under a straightforward application of basic contract law and this court's precedents interpreting plea agreements. I appreciate that this may not be the record, but I do want to ask some questions to fully understand the government's position. Would you agree, Mr. Hobson, that if the government- if there were evidence of sandbagging, in other words that the government knowing at the time that the plea was entered into, it would make an argument for a substantially above guidelines range sentence, that that might be at least an indication of bad faith? No, Your Honor, I would not. First of all, I don't think that would be sandbagging. That is something that is expressly provided for as a possibility in the plea agreement. As a practical matter, the government does not know- in almost every case I've been involved in- does not know what sentence it's going to be seeking at the time of the plea agreement, absent a sort of mandatory structure. To sandbag is to do what you have the power to do. It's just disreputable and in bad faith. And in this case, it's hard for the government to say that they didn't know that it was an extraordinary case that, I mean, involved arson at wedding venues, shooting at authorization to shoot up a funeral. Absolutely. He was number two. He was a founder. So there's nothing the government didn't know about all of these really egregious circumstances when it entered the agreement. So I hear your adversary say, why shouldn't we have reasonably relied on the fact that the government, knowing all of these things, was willing to negotiate a plea agreement in which these factors would be reflected only by some extraordinary motion by the government. But, Your Honor, there was no representation in the plea agreement about what sentence the government would be seeking. Yeah, but that's what sandbagging is. Sandbagging is leaving open an option or exercising an option in a way that is unfair and disreputable. I guess I'm heavy under... It's not an unavailable option. Then the defense would be sandbagging us every time they ask for a below-guideline sentence. These are carefully negotiated agreements that preserve the party's rights. It is not uncommon for the government to seek above- or below-guideline sentences. I agree that the norm is to seek a guideline sentence, but it is not out of the ordinary to seek an above- or below-guideline sentence at times. We typically do not make that decision until after we have the PSR. I have to get approval of the criminal division chief of the office to even seek an above-guideline sentence. That approval is not always given. And, candidly, I did not know what sentence I was going to recommend at the time of the plea here. We didn't have the precedence report. Now, not all of that is in the record before the court, but I can bring you into the history here. I do think the cases that talk about sandbagging... Did you say you had to get approval from the criminal division chief? Yes, to seek an above-guideline sentence, you have to have approval from the criminal division chief. Also, to seek a sentence at the high end of the guidelines, you have to have approval of the criminal division chief. The cases that they've cited that talk about the concept of sandbagging, Habas, Wilson, Taylor, those are about a different provision within the plea agreement. Those are about the stipulated guidelines calculations, and they are cases where the government changed their recommendation of what the appropriate guidelines calculation was later. That is not what happened here. Here, what happened is we all agreed what the stipulated guidelines calculation was, and that didn't change. The only thing that the government did was suggest that the court should impose an upward variance and impose a sentence higher than the guidelines calculation. Habas, Wilson, Taylor, those are cases about the guidelines calculation. And remind me, what was it after the fact that led the government or prompted the government to ask for an upward variance? There were a number of factors considered altogether that we thought made it appropriate. One was the extensive nature of the crime, the fact that it was over 20 years this defendant had been ordering violence, a wide array of violence, that he was supervising 300 people in this gang, many of them minors who he recruited, who he caused to carry out the crimes on his behalf, making it harder to detect him. The fact that people beneath him in the gang had received sentences of up to 20 years, despite being far less culpable than him. Did that happen, did those other sentences happen after the plea? The very first sentence in this case was a 20-year sentence, which was ordered to run consecutive to a seven-year state sentence. And that was before Mateo was even charged into the indictment because of a superseding indictment. So all these, what I take it the government would describe as aggravating facts, were known to the government at the time of the plea. Is that correct? Yes, Your Honor, and to the extent they justified various guidelines enhancements and were relevant under the guidelines, they were incorporated in the guidelines analysis. One of our arguments in sentencing was that the guidelines were actually, didn't encompass the full nature of this defendant's crimes. Because, for instance, there's an enhancement for supervising five people. He supervised 300 people. There's an enhancement for having a gun. This organization had hundreds of guns. The suggestion is that at the time you entered into the plea agreement, you knew all of these things and you probably or should have had a sense that you were going to seek an above-guideline sentence and that you were under some obligation to let them know. I mean, how do you respond to that? There's no obligation to let them know. The plea agreement does not provide for any obligation to give the other party notice of its sentencing recommendations, and we know that because the defense did not give notice of their intent to seek a below-guidelines variance. I will note another thing is that we do rely on the PSRs when they come out because that's where we learn mitigating information about the defendant that we might not otherwise know. Sometimes there are new facts when you get the PSR. Well, in particular about the defendant's upbringing and any mental health issues and the like, there was a real lack of mitigating factors here, which was another thing that went into our consideration. Oh, no, I have two minutes left, but those were the points that I have. You don't have to use up your time. Those were the points I had. If the court has any other questions, I'm happy to address them. Thank you. Counsel? Sorry, I didn't understand the procedure. So I wanted to raise, you know, it feels fortuitous that we're here with Juan Hernandez's attorney in his case, which is entirely different from my client's, but it did. I was looking at the record in his case, which does raise something that I think is important here, which is that Mr. Hernandez had a plea agreement with identical language, and in that case, when the government went to sentencing, in its sentencing submission, it said, and I quote, the parties have agreed to a stipulated sentencing range of 135 to 168 months, and then they asked for that sentence, right? So that same exact agreement, same exact language, entirely different result, and if the agreements are the same, which they are, then the reasonable expectations that flow from them should be the same. And I think the position of the facts were different in terms of the role of each defendant. Yes, but the government is referring to the same language to justify a different result, and to kind of respond to the questions that your honors were asking Mr. Hobson earlier, why stay silent, right? If the government knew all of this, why stay silent? Well, the government did not know what the PSR might show, particularly in terms of mitigation, right? That's fair. Yes, but the government knew. If the PSR were to report facts about the background, personal circumstances, et cetera, that might persuade the government not to seek an above guidelines range. I mean, I would argue there was significant mitigation here, enough so that probation mentioned it in their statement. My point is you don't know when you sign the plea agreement what the PSR will show. Quite often there may be undiscovered convictions is an issue we see. Yes, your honors, but despite significant mitigation, the government advocated for an above guidelines sentence, which suggests to me that this was their position to begin with, it remained their position, and it was their position regardless of what the PSR showed. And I think the only reason to stay silent, given the framework in which we operate, in which the common understanding is that they will advocate for a guideline sentence, which they have agreed to, which they did in Mr. Hernandez's case. The common understanding is not necessarily between your client and the government because if it was understood that variances would not be sought, then it's odd that your client sought a variance also. Yes, but I think the reason to stay silent is a reliance on that common understanding and to induce a plea based on that common understanding. What I'm saying to your honors is that norms create expectations and the government knows that. This is a practice, I've been using the word rule, but it's a very unique to the Southern District of New York exception that you want to carve out. Is that correct? Well, I just think that we're operating- Is that correct? Unique to the Southern District? Yes. I'm saying- Because you're saying that that's the way that the Southern District of New York operates, and so everybody reasonably expects that it will abide by these norms unique to its office, and so you should in this case recognize- you, meaning the court, should in this case recognize that that is the practice in a particular office and conclude that this case represents a unique variance, to use that word, from that practice. Is that the argument? That's not the argument. The argument is that what this court is supposed to look at is reasonable expectations and reasonable understandings. And in this case, to look at the reasonable understandings and expectations, the court has to look at that common practice, that that is part of the universe- When you say common- I'm just trying to understand. When you say common practice, it is not a common practice of the Department of Justice. You're saying it's a common practice within the U.S. Attorney's Office in the Southern District of New York. Is that correct? That is the universe of facts of this case to which this court applies a reasonable expectation analysis. But the analysis is the same. It would apply to a different plea agreement and a different set of facts. I'm not asking for a unique exception. I'm asking, for your honor, to look at the universe of this situation. And in this case, the norms have created an expectation. And the government going from silence, going from absolute silence, to an above-guideline sentence is a change. And it is a change that did sandbag my client. And this is a type of unfairness that we don't need. It's just not necessary to put clients in this position and to create this situation. It's not just about Mr. Mateo. It's about basic fairness in how plea agreements are made and enforced. Thank you very much. So, as to this matter, we'll reserve the decision. Thank you. And we'll hear from Mr. Tomeo for Mr. Hernandez in 23-6254. May it please the court. My name's been bandied about a bit, so I'm Peter Tomeo. I represent Juan Hernandez. And we had a separate case here and a separate issue. In fact, Judge Nathan had unconsolidated our case from the others several years ago as this case wandered up and down with this court. Our issues are very narrow. It's currently reconsolidated. No, it isn't. There's no order. I checked the dockets carefully, and I spoke to a clerk yesterday. They told me it was consolidated for argument, but that the issues would be resolved separately because they're totally separate. Our appeal has to do with the special conditions of supervised release. We raised three of them, kind of pursuing two in this argument. The two conditions that we're objecting to are the location provision of the non-association condition. In other words, the court imposed a special condition, which, by the way, came without notice to Mr. Hernandez. It wasn't in the PSR. The judge just said it for the first time when she read the other special conditions. But there was no objection by the defendant? No, but really there wasn't much of an opportunity to object. I mean, he really would have to have been really focused. How much opportunity does a lawyer need to have? Well, I think a lawyer, in terms of a condition, needs to see the condition in advance. That's why it's in the PSR. And that's why this court has looked differently at conditions where the court has given notice. But there wasn't even an objection that you had no opportunity to make a full-throated objection? Well, I can understand what you're saying, Judge Jacobs. But what I'm saying in the practicality of this, this is a condition that's being read for the first time at the end of the sentencing. Obviously, the sentencing is focusing on the term of incarceration. And this is also pre-Betz when this took place. This court's decision in Betz came down after this sentencing. I think today there's a lot more attention to the special conditions being given by the judges and the parties at the time of sentencing. We've had a lot of appeals about special conditions. Well, if your honors look at the record of this case, we were specifically asked to address those issues. And there's an order which basically says we should go back and look at those and brief those and argue those to the court. So we're going back. And I see here. I don't think you told us the second special condition. Oh, the other special condition is the, and this you have had a lot of case law since we filed our brief, which is the search provision. Which includes, in the case of Mr. Hernandez, a search of his electronic media, which would obviously include a cell phone, where that was not really part of this case. But he conceded that his drug dealing involved the use of texts and phone calls. There was one occasion where the PSR indicates they did use text messages in connection with the undercover. But that's not really challenged. That fact was not challenged, no. So if that fact is sufficient for that condition, then I'll concede that. But I'm saying that I think in this type of thing, that would not be normally enough because it's incidental to the offense. It's not part of the offense. It's not like a case in which, I think it was Lewis, where this court dealt with an individual who was using electronic media as part of the fraud over an extended period of time. And then said he should not have a search of that. We certainly did not object to the idea of searching the client's house, or the way it works, for weapons. Clearly, it has a history of violence. And clearly, the probation department would be entitled to make sure that they were safe at a minimum. Is there a difference qualitatively between searching, allowing probation to search his house, and allowing probation to search his cell phone, given what I think you have acknowledged is the fact that he did use his cell phone at least a few times to perpetrate this crime? Well, I think it's an order of magnitude. It's a question of expectation of privacy where someone has information on a cell phone that goes far beyond the phone itself and far beyond the messaging. I mean, somebody's cell phone is going to contain- Either way, the condition required reasonable suspicion, right? It required reasonable suspicion, you're right, Your Honor. Yeah. However, I'd like to just spend, have only two minutes, a little more time on the location provision because I find that to be unreasonable. The government defends it by arguing that you can read into it what's known to him. But that is practically not a practical condition. It's not part of the condition itself. We have done that, though. In other words, we have narrowed the conditions on appeal to assume that it provided a scientific knowledge requirement. And if you did that in this case, I would consider it a victory because right now I think it doesn't require that. It requires it to be known. It could be known to the probation officer. He's also entitled to work with local law enforcement so he could have a DEA agent or somebody who says, oh, yes, this is a well-known drug location. Don't forget, Mr. Hernandez has been incarcerated for about six years. He was arrested in 2019. He's been continuously incarcerated. He's not going to be released for another 10 years. So in 16 years, the difference of what he would know is going to have changed. Now, he's not supposed to have any dealing with anybody in the black mob or the Latin kings. So he's not going to learn, if he's complying with the conditions, he's not going to learn about the current locations that they're going to be using 10 years from now. The only known is going to be, well, that's a well-known, notorious place where the black mob operates. And I can see that. The government will also kind of try to split hairs, I think, in terms of, well. So if the condition had said he's not to frequent neighborhoods known to him to be controlled by the black mob or the Latin kings, you would consider that a victory? I would consider that reasonable. Thank you. If the court has no further questions, I have some time for everybody. Yes, we'll hear from the government. May it please the court. Again, I'm Adam Hobson from the U.S. Attorney's Office. And I argue in this case as well as the case below.  I will, again, rely primarily on questions from the court. Let me ask you about the location condition. It says the defendant must not frequent neighborhoods to be controlled by the black mob or the Latin kings. It's like future tense. It's going to be 10 years from now and then future tense from then. I'm worried you might be reading. Maybe there's a typo in the brief you have, but the condition said known to be controlled by the Latin kings or the black mob. Oh, yeah, that's what it says. And actually, I wanted to focus on that language because I think that makes... Known by whom? Well, I think it's obvious that it's known by him. Both the context of that sentence and also this court's precedence in cases like Green where the court has expressly interpreted these provisions to mean known to the defendant. What neighborhoods are controlled by whom unless he was consorting with drug dealers, gang members, and known criminals? He might not know. I mean, in which case he will not be breaching the condition by being there. The court has said in Green and other cases since Green that there are no inadvertent violations of supervised release. So you would have to prove that he knew it. So that is baked into it. And in fact... How do you do that? So just take me through this. Let's say that I'm Mr. Hernandez and I'm on supervised release and I'm subject to this location condition. And I am in whatever the neighborhood is. And I walk across the street. How does the... And it turns out that it is a neighborhood... That I walk into a neighborhood that is controlled by one of these two gangs. And the probation officer finds this out. Presumably, maybe there's some location device. Well, I don't know. How does one then determine that he knows that it's controlled by one of these two gangs? Well, a few things on that. One, I would remind the court that there's also frequent... He has to be frequenting a location known to be controlled. So I don't think an inadvertent walking across the street would be sufficient under the terms here. Okay, so I go there three... I cross the street three times. I don't even know what frequenting... Now you've raised another issue. And this court has addressed before that the conditions cannot be read to address every potential permutation that one can come up with. But we would have to prove at a violation hearing that he knew that this area that he was frequenting was controlled by the Latin Kings or the Black Mob. We could show that by... If his probation officer had told him this is an area controlled by the Latin Kings, you can't go there. We could show that if we had text messages from his phone that said, hey, come meet at the Latin Kings hangout here in this location. There are a number of ways you might be able to prove it. But you would have to prove it, of course. So you're watering it down a little bit. But if the probation officer, that's a good point, told him these are marked out or demarcated particular neighborhoods, then that might be enough. Of course, Your Honor. And remember that this is in conjunction with all the other conditions of supervised release where a probation officer is conducting home visits. If a probation officer sees that every time they go to the defendant's apartment that it's surrounded by members of the Latin Kings who are selling drugs, then that might give the probation officer calls to investigate, calls to talk to the police, calls to talk to the defendant about that. The first sentence of the condition says they may not associate – he may not associate or interact with gang members, associates, et cetera. Why do you need the sentence about locations? Do they just happen to walk through the neighborhood but don't associate that that's a violation? Well, there are a number of ways that it might come up. One might be that it's an area controlled by the gang but you don't have proof that he himself is consorting with the individual gang members. Remember that the conditions of supervised release are meant to deter and are meant to promote rehabilitation. So there can be a danger of this defendant living in a- He can walk through that neighborhood if it's controlled by the black mob. Well, I would say he can't frequent that neighborhood. But I think that also the black mob tends to be controlling narrower swaths of territory than an entire neighborhood. And again, I want to emphasize that these are – this is a routine condition in these gang cases. This court has upheld even broader conditions in, like, the Rachmatov case, which didn't have the language limiting it to known. It wasn't just limited to the Latin kings but was to- But then we seem to, in that case, to have assumed the limitation known by him. Yes. Ever since Green, the court has been clear that that's always an implicit condition here. Floyd had the same very broad, or much broader than here, location restriction, which was any establishment or other locale where gangs may meet. So, you know, these are broad at times. They are all limited by the fact that you have to have a knowing and not an inadvertent breach. And they are all, especially in these gang cases, geared towards rehabilitating and deterring criminal conduct. I want to – before – I don't want to move on from non-association prematurely. But I do also want to note that there was an opportunity to object here. It wasn't just the fact that a defense counsel could always say I object. But after reading these conditions and before formally entering sentence, Judge Caproni asked if either party had any objections. And defense counsel said no. So there was an opportunity to object here. So really, under any standard of review, this condition should survive. But we do think that it's plain error. Would you address the cell phones just briefly? Of course, Your Honor. This court has repeatedly held that evidence that a defendant used electronic devices in committing a crime, also the evidence that a defendant committed crimes with others, with accomplices, which thus suggested communications between individuals to commit crimes, that this is a reasonable condition in those cases. The most recent one, I think, was just issued a couple weeks ago, and Judge Jacobs was on the panel, the Ortiz case, which is very similar to this one, where the defendant was a drug dealer who had a history of arranging a drug sale with a cell phone. And importantly, the fact that it was also, like this condition, limited to reasonable suspicion. This court has held that suspicionless searches can be justified. The Olivares case held that. But where it's a search conditioned on reasonable suspicion, it makes it a much more reasonable search condition, and that was the case here. It's a condition that also was upheld in cases like Washington and Thomas, both of which were cases involving violence. Washington, I think, was a carjacking and armed robbery case in which the defendant had set up the robbery with a cell phone. So it's more attenuated than I would say the use of the cell phone was here. May I ask a question? It's a very practical question. So in Murmatov, as you point out, we assume that the known language meant known by him in that case. One other way to do it is just to remand and clarify that on as a matter of judgment, that it's known by him. So add the words by him. If we do it, how does that translate into a condition I don't even recall? When was his sentence? What was his sentence? 17 years. Okay, 17 years. So 17 years later, when he's on supervised release and he's subject to these conditions, how is that reflected? It's reflected because he can't violate the condition without knowingly violating the condition. Practically speaking, is that reflected in some sort of an amended judgment by the district court? If we were to issue an order that says we assume that it meant known by him, not just known, how is that practically speaking reflected? Well, in this court's prior cases like Green where the court interpreted it that way, also Rachmatov and Floyd, it was not remanded, so there was presumably not an opportunity. I understand that, and I'm trying to understand, does someone then look at the appellate record, or is that reflected in a judgment somewhere? Your Honor, I think it was simply acknowledgement of the legal principle that obviously you have to have a knowing breach of violations of supervised release. So it doesn't need the word known to implicitly mean you have to know. There has to be a knowing breach. It can remind someone 17 years later that that's what was really meant. And with the controlling case law, and no one would be able to bring a violation of supervised release proceeding without being able to prove that. Thank you very much. Mr. Chumayo, you've got three minutes for a vote. Hopefully I'm not going to use the whole three minutes. Your Honor, I think Judge Lothi, I think you've hit on a point, which is that 10 years from now, I'm not going to be here. Hopefully I'll be sitting in a- Well, let's hope you are. Hopefully I'll be in this, but not standing in court anymore. Let's not be too hasty. Judge, it's harder being an advocate than a jurist. Oh. Yes, it is. We can have that debate. We'll have that discussion sometime. But in any event, Your Honor, I do want to point out, I looked quickly over the transcript, and I have to correct my colleague. Judge Caproni did not give them an opportunity to object. Immediately after she announced that condition, moved on to financial conditions. They discussed forfeiture. And then Judge, sorry, not Judge, Mr. Hopson moved to dismiss the open counts. And then she said, is there anything further? So I guess, you know, did he have an opportunity to say something? I object. He could have said, I object, but he really wasn't the question that- What's interesting, so, you know, these sentencings happen very quickly. But as a former prosecutor, I see the judge get up and leave, and you get up and you say, I object. So there is always time, and you don't have to necessarily explain, just I object. That's true. I've gotten judges to turn around and come back to the bench after they started leaving when I've objected. Not necessarily something I try to do, but I have. But I would say that if the court does feel that that condition would save this, that phrase would save the condition, the appropriate thing to do would be to remand it for the judge to add it to the conditions. I don't think it would be one where- Well, not only might I think or we think that, but I understood- That's what I think. You think that too?  Okay. Yes. I think that would have to be done, because as I say, 10 years from now- So if you think that and we think that and the government thinks that, who else do we need to get on board here? I don't think we need anybody else on board, but I think it needs to be in the conditions, because the practical way that this is going to be done is that the probation officer, who's going to be supervising Mr. Hernandez 10 years from now, is not going to read this transcript. That goes to my question. So in a line of cases, we seem to have done that and just said it without remanding, as Mr. Hobson pointed out. My question was, practically speaking, how does that work? But it seems to work, and we've done it. Well, you've done it, but how does it work? I mean, we're dealing- I've been doing this for 43 years, and I know practically speaking that probation officers are not going to be reading this condition. Now you have a situation where an officer may be violating somebody for going across the street and standing at a bus stop in front of a, if they still exist then, a candy store, in which whatever the black mob looks like 10 years from now is operating. And how does he know? Also 17 years from now. Well, 17 years from the day of his arrest in 2019. Some time has already passed. Yes, some time has passed, and presumably he is no longer in contact with the street gang. I think we have to assume that. Thank you. And also, just one last thought, is he still has that condition that he can't associate. And we're not objecting to that. So if he's getting information because he's associated with a gang member or a gang member has a cell phone or whatever they're using 10 years from now, it's taken and it shows them contacting, that's a separate violation. Thank you, Your Honor. Thank you very much. What was our decision? And we'll hear argument in the next matter, Consumer Financial Protection Bureau versus Clear Creek Legal and Ryan Sasan. Case numbers 24-697-24727, 24-583, and 24-554. I guess the high school kids don't want to hear me. Thank you.